**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| LAKE REGION HEALTHCARE CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>XAVIER BECERRA, Secretary of U.S. Department of Health and Human Services,<br><br>Defendant. | Civil Action No. 1:20-cv-03452 (JMC) |

## <u>MEMORANDUM OPINION</u>

Under the federal Medicare program, participating hospitals are compensated every time they discharge a Medicare beneficiary. The amount of compensation per discharge depends on the diagnosis. Diagnoses are assigned a predetermined rate meant to compensate the average operating costs of treating that diagnosis. Some rural hospitals may receive additional reimbursement at the end of the fiscal year if their patient volume declined suddenly due to circumstances beyond their control. This additional funding, known as a "volume decrease adjustment" (VDA), is supposed to ensure that hospitals recoup all their fixed costs. In Fiscal Year 2013, Lake Region suffered a qualifying decline and applied for a VDA. The hospital argued that the VDA should make up any difference between a hospital's actual fixed costs and the portion of its per-discharge compensation that was meant to compensate fixed costs. The Secretary of the U.S. Department of Health and Human Services (HHS) disagreed, contending that longstanding policy dictated that VDA amounts were supposed to reimburse any difference between a hospital's actual fixed costs and its total per-discharge revenue, without trying to isolate the portion intended to cover fixed costs. After the Secretary denied Lake Region's VDA request in administrative proceedings, the hospital brought

1

suit in this Court. For the reasons stated below, the Court denies Lake Region's Motion for Summary Judgment, ECF 17, and grants the Secretary's Cross-Motion for Summary Judgment, ECF 20.[1]

## I.    BACKGROUND

### A.  Statutory Background

The Medicare program, established by Title XVIII of the Social Security Act, is a nationwide, federally funded health insurance system for elderly people and people with disabilities. *See* 42 U.S.C. §§ 1395 *et seq*. Through a "complex statutory and regulatory regime," the program reimburses health care providers for certain costs they incur in treating Medicare beneficiaries. *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1227 (D.C. Cir. 1994) (quoting *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 404 (1993)). The Secretary of the U.S. Department of Health and Human Services (Secretary) administers Medicare through a division of HHS known as the Centers for Medicare & Medicaid Services (CMS). *Anna Jacques Hosp. v. Burwell*, 797 F.3d 1155, 1157 (D.C. Cir. 2015).

Private insurance companies that contract with the CMS—called "Medicare administrative contractors"—determine the payments owed to participating hospitals. 42 U.S.C. § 1395h(a). Hospitals submit their annual cost reports to Medicare administrative contractors, who audit the reports and issue final determinations specifying each hospital's reimbursement amount. 42 C.F.R. §§ 413.20(b), 405.1803(a). If a hospital is dissatisfied with its final determination, the hospital may appeal to the Provider Reimbursement Review Board (PRRB). 42 U.S.C. § 1395oo(a). The Board's decision is final unless the Secretary, acting through the CMS Administrator, "reverses,

---

[1] Unless otherwise indicated, the formatting of quoted materials has been modified throughout this opinion, for example, by omitting internal quotation marks and citations, and by incorporating emphases, changes to capitalization, and other bracketed alterations therein. All pincites to documents filed on the docket are to the automatically generated ECF Page ID number that appears at the top of each page.

affirms, or modifies the Board's decision." 42 U.S.C. § 1395oo(f). The provider would then have 60 days to challenge the CMS Administrator's decision if they remained unsatisfied. *Id.*

Initially, HHS reimbursed hospitals for all inpatient costs incurred in treating Medicare beneficiaries, so long as those costs were deemed "reasonable." *Transitional Hosps. Corp. of La., Inc. v. Shalala*, 222 F.3d 1019, 1021 (2000). But Congress grew concerned that this reimbursement scheme did not incentivize hospitals to operate efficiently. *Id.* So in 1983, Congress replaced the reasonable-cost reimbursement scheme with the Inpatient Prospective Payment System (IPPS) that remains in use today. *See id.* IPPS reimburses hospitals based on the diagnosis associated with each patient discharge; some diagnoses tend to be more expensive to treat, so they demand a larger reimbursement. The reimbursement amount for each diagnosis is calculated through a multi-step process. First, Medicare authorities determine a standard, nationwide rate based on the average operating cost of inpatient hospital services. *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1008 (D.C.C. 1999). That standardized rate is then adjusted to reflect variations in the resources needed to treat a specific patient. *Id.* at 1008–09.[2] Diagnoses are organized into "diagnosis-related groups" (DRGs) and each DRG is assigned a weighting factor that corresponds with the average cost of treating that specific diagnosis. *Id.* The predetermined, standardized nature of these DRG payments creates risk and opportunity: hospitals bear a loss if the actual cost of treating a patient exceeds DRG revenue, but they earn a profit if revenue exceeds costs.

IPPS also includes a few accommodations for sole community hospitals (SCH)—hospitals that offer the only source of inpatient hospital services for a rural community. Specifically for this case, SCHs are entitled to receive a VDA if their total number of patients drops by more than five percent due to circumstances beyond their control. 42 U.S.C. § 1395ww(d)(5)(D)(ii). The VDA

---

[2] The nationwide rate is also adjusted to accommodate regional variations in labor costs. 42 U.S.C. § 1395ww(d)(2)(H).

was intended "to fully compensate the hospital for the fixed costs" incurred during these downturns, including "the reasonable cost of maintaining necessary core staff and services." *Id.*

However, the Medicare Act does not specify how to calculate the VDA. Instead, the Secretary of HHS has provided guidance through regulations and case-by-case adjudications. The Secretary's first regulation, promulgated in 1983, emphasized that the VDA was intended "to compensate the hospital for the fixed costs it incurs in the period in providing inpatient hospital services." Prospective Payments for Medicare Inpatient Hospital Services, 48 Fed. Reg. 39,752, 39,781 (Sept. 1, 1983). The regulation explained that fixed costs are "those over which management has no control," such as "rent, interest, and depreciation," and that variable costs are "those costs for items and services that vary directly with utilization," such as food and laundry. *Id.* at 39,781–82. Costs that did not fit neatly into either of these categories were labeled "semifixed costs" and left to be evaluated on a case-by-case basis. *Id.* Regarding the VDA calculation itself, the regulation did not prescribe an exact formula, but noted that the amount should be based on a hospital's "needs and circumstances," its "fixed (and semi-fixed) costs," and the "length of time [that] the hospital has experienced a decrease in utilization." 42 C.F.R. § 405.476(d)(3) (1984) (now codified at 42 C.F.R. § 412.92(e)(3)(i)(B)).

The Secretary amended the regulations in 1987 after noticing that some hospitals claimed VDA eligibility because their patient volume declined by more than five percent, even though their DRG revenue exceeded total operating costs. Changes to the Inpatient Hospital Prospective Payment System and Fiscal Year 1988 Rates, 52 Fed. Reg. 22,080, 22,091 (proposed June 10, 1987). The Agency believed that these hospitals had been "fully compensated" for their fixed costs and therefore ineligible to receive any additional adjustment. *Id.* To clarify this confusion, the Agency revised its regulations and capped the VDA amount by declaring that it should not "exceed

the difference between the hospital's Medicare inpatient operating costs and the hospital's total DRG revenue." 42 C.F.R. § 412.92(e)(3) (1987). This ceiling did not alter the calculation method used to determine the precise amount of a VDA; the three factors identified in the 1983 regulation—the hospital's needs and circumstances, fixed costs, and time of underutilization—were still relevant for calculating the VDA. *Id.*

During the following decades, the Agency tried to further clarify the VDA calculation method. The Medicare Provider Reimbursement Manual (PRM) that was issued in 1990 reiterated that the VDA was intended to compensate eligible hospitals "for [] fixed costs" and should "not [] exceed the difference between the hospital's Medicare inpatient operating cost and the hospital's total DRG revenue." PRM 15-1 § 2810.1(B) (Mar. 1990). It also included a few examples showing how the VDA should be calculated. *See* ECF 20 at 19 (exhibiting the PRM's examples).

The preambles to rules setting the IPPS payment rates for fiscal years 2007 and 2009 regulations reduced the PRM's examples to a more precise formula: they stated that the VDA should be calculated by "subtracting the second year's [DRG revenue] from the lesser of: (a) The second year's costs minus any adjustment for excess staff; or (b) the previous year's costs multiplied by the appropriate IPPS update factor minus any adjustment for excess staff." Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2007 Rates, 71 Fed. Reg. 47,870, 48,056 (Aug. 18, 2006); Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2009 Rates, 73 Fed. Reg. 48,434, 48,630–31 (Aug. 19, 2008).

Beginning in 2014, the Secretary, acting through the CMS Administrator, reversed a series of PRRB decisions finding that Medicare administrative contractors incorrectly calculated hospitals' VDA amounts. The PRRB believed that the VDA should make up any difference between a hospital's fixed costs and the portion of DRG payments meant to cover fixed costs. *See,*

*e.g.*, *Fairbanks Mem'l Hosp. v. Wisconsin Physician Servs./BlueCross BlueShield Ass'n*, 2015 WL 5852432, at *4 (CMS Admin. Aug 5, 2015); *St. Anthony Reg'l Hosp. v. Wisconsin Physicians Serv.*, 2016 WL 7744992, at *2 (CMS Admin. Oct. 3, 2016); *Trinity Reg'l Med. Ctr. v. Wisconsin Physician Servs.*, 2017 WL 2403399, at *1 (CMS Admin. Feb. 9, 2017). Admitting that they did not have the actuarial data to calculate the portion of DRG payments meant to compensate fixed costs, the Board used the actual fixed-to-variable-costs ratio as a proxy. *E.g.*, *Trinity Reg'l Med. Ctr.*, 2017 WL 2403399, at *1. The Secretary reversed the PRRB's decision in each case, emphasizing that a VDA should be provided only if DRG payments fell short of compensating fixed costs.

However, despite rejecting the PRRB's calculation method for years, the Secretary was eventually persuaded by its logic. While maintaining that the prior "approach . . . [was] reasonable and consistent with the statute," the Secretary adopted the PRRB's new calculation method prospectively in 2017. Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and the Long-Term Care Hospital Prospective Payment System and Policy Changes and Fiscal Year 2018 Rates, 82 Fed. Reg. 37,990, 38,180–83 (Aug. 14, 2017) (final rule) (codified at 42 C.F.R. § 412.92(e)(3)).

### B.  Factual and Procedural Background

The Parties do not dispute the underlying facts; only how the law applies to those facts. Lake Region Hospital is located in Fergus Falls, Minnesota. AR 32. Lake Region was designated as a sole community hospital during Fiscal Year 2013, and inpatient discharges decreased by more than five percent during that year. AR 32, 33. Therefore, Lake Region was entitled to have a VDA calculation performed. AR 33.

Lake Region sought a VDA to reimburse $1,947,967 in operating costs. AR 33. Lake Region arrived at this amount through a three-step process that resembled the PRRB's approach. First, the hospital calculated the percentage (72.07%) of total inpatient operating costs ($10,026,809) that were fixed costs ($7,226,321). AR 35. The hospital then multiplied its total DRG Revenue ($7,323,927) by that percentage to isolate the portion of DRG payments ($5,278,354) that were, according to the hospital, intended to cover fixed costs. AR 33, 35–37. Finally, the hospital subtracted the fixed-cost portion of DRG payments ($5,278,354) from its total fixed costs ($7,226,321) to determine the amount of fixed costs that had not yet been reimbursed by DRG payments. AR 36–37.

The Medicare contractor disagreed with Lake Region's calculation method and denied Lake Region's request. AR 32. Relying on previous decisions by the CMS Administrator, the Medicare contractor concluded that VDA payments were intended to compensate hospitals for unreimbursed fixed costs, but because Lake Region's annual DRG revenue ($7,323,927) had exceeded its total fixed costs, the hospital had already been fully compensated and ineligible for any additional VDA payment.[3] AR 35–37. Lake Region appealed the Medicare contractor's determination to the PRRB.[4] AR 33.

The PRRB disagreed with the Medicare contractor's calculation. Reiterating the calculation method that it had promoted in other administrative decisions, the PRRB calculated Lake Region's VDA amount by "estimating the fixed portion of the hospital's DRG payments

---

[3] Although Lake Region's fixed cost amount did not match the Medicare contractor's, the discrepancy is immaterial for purposes of this case because both figures were less than the total DRG payments that Lake Region received.

[4] Lake Region initially requested a VDA to cover $2,571,404 operating costs and $50,851 capital costs. AR 33. After the Medicare contractor denied this first request, Lake Region filed a second request that is the subject of this case. In its second request, Lake Region sought only $1,947,967 for operating costs. Lake Region's appeal to the PRRB claimed entitlement to $1,947,967 for operating costs and $54,983 for capital costs. AR 33. In its appeal to this Court, Lake Region dropped its claim seeking reimbursement of capital costs and seeks only a VDA of $1,947,967 for operating costs. ECF 2 at 11 n.4.

(based on the hospital's fixed cost percentage as determined by the Medicare contractor), and comparing this fixed portion of the DRG payment to the hospital's fixed operating costs." AR 38. The PRRB noted that the decisions by the CMS Administrator reversing prior PRRB adjudications using this formula were not binding on the Board. AR 39.

The CMS Administrator reversed the PRRB. AR 19. Although the CMS Administrator acknowledged that the PRRB's method was adopted prospectively in 2017, the Administrator maintained that the Board's method misconstrued the regulations that were in place during Fiscal Year 2013. AR 10–13, 17. Because Lake Region's DRG revenue ($7,323,927) exceeded its fixed costs ($7,226,321), the hospital's VDA request was denied. AR 18–19.

## II.    LEGAL STANDARD

A court grants summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A "material" fact is one with potential to change the substantive outcome of the litigation. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.

In an APA case, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006). The Court will "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "unsupported by substantial evidence," *id.* § 706(2)(E).

### III.    ANALYSIS

The Parties' cross-motions for summary judgment dispute four claims: (1) that the Secretary adopted the calculation method without complying with notice-and-comment procedures; (2) that the Secretary's method of calculating the hospital's VDA amount violates 42 U.S.C. § 1395ww(d)(5)(D)(ii); (3) that the Secretary's calculation method was arbitrary and capricious; and (4) that the Secretary's calculation method violated 42 C.F.R. § 412.92(e)(3). Each of these claims is discussed below and, ultimately, dismissed. Instead, the Court grants summary judgment to the Secretary on each claim.

### A. Lake Region's notice-and-comment claim fails because the Secretary's calculation method did not change in 2014.

Lake Region argues that the Secretary, acting through the CMS Administrator, changed the Agency's policy in 2014 without following mandatory notice-and-comment procedures. ECF 17-1 at 33–34. Lake Region contends that the operative policy during Fiscal Year 2013 originated in the 1990 version of the PRM and was reiterated in preambles to rules setting the IPPS payment rates for fiscal years 2007 and 2009 regulations. *See* PRM 15-1, § 2810.1(D); Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2007 Rates, 71 Fed. Reg. 47,870, 48,056 (Aug. 18, 2006); Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2009 Rates, 73 Fed. Reg. 48,434, 48,630–31 (Aug. 19, 2008). These publications all indicated that the VDA should be calculated by "subtracting the second year's [DRG revenue] from the lesser of: (a) The second year's costs minus any adjustment for excess staff; or (b) the previous year's costs multiplied by the appropriate IPPS update factor minus any adjustment for excess staff." Said more simply, Lake Region argues that before 2014, the VDA amount was calculated by subtracting a hospital's total DRG revenue from its total operating costs.

According to Lake Region, the Agency departed from this calculation method in a series of administrative adjudications. The first of these decisions was *Unity Healthcare Muscatine, Iowa v. Blue Cross Blue Shield Ass'n/Wisconsin Physicians Serv.*, 2014 WL 5450066 (CMS Admin. September 4, 2014). The Secretary, acting through the CMS Administrator, reversed the PRRB's decision, which had held that the VDA should reimburse all fixed and semi-fixed costs that were not covered by DRG payments. *Id.* at *4–5. Citing administrative decisions dating back to 2006, the CMS Administrator found that "the VDA is intended to compensate qualifying hospitals for their fixed costs, not their variable costs," and therefore limited the VDA amount to any fixed costs that had not been compensated by DRG payments. *Id.* at *5; (citing *Greenwood Cnty. Hosp. v. Blue Cross Blue Shield Ass'n/BlueCross BlueShield of Kansas*, 2006 WL 3050893 (PRRB Aug. 29, 2006)).

Lake Region argues that these administrative adjudications constituted a "substantive legal change" in the Agency's policy and therefore demanded notice-and-comment procedures. ECF 17-1 at 33. The Medicare Act requires HHS to provide a public notice-and-comment period for any "rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under [Medicare]." 42 U.S.C. § 1395hh(a)(2). Even if a new substantive legal standard is articulated in an interpretive rule, it may still require giving the public notice and a chance to comment. *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1811 (2019).

This Court disagrees with Lake Region's claim. Neither the PRM, the 2007 preamble, or the 2009 preamble provides conclusive evidence of a change in policy. Admittedly, these materials contain some language that, if read in isolation, suggest the VDA should reimburse hospitals for

10

all fixed and variable costs left uncompensated by DRG payments. But statutory and regulatory provisions should not be read in isolation. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000). Regulations should be interpreted "as a whole, in light of the overall statutory and regulatory scheme." *Campesinos Unidos, Inc. v. U.S. Dep't of Lab.*, 803 F.2d 1063, 1069 (9th Cir. 1986).

The text and history of the statutory scheme governing volume decrease adjustments make clear that the VDA is intended to reimburse hospitals for only fixed costs, not variable costs. Congress instructed the Secretary to "provide for such adjustment to the [DRG] payment amounts . . . as may be necessary to fully compensate the hospital for the *fixed costs* it incurs in the period in providing inpatient hospital services." 42 U.S.C. § 1395ww(d)(5)(D)(ii) (emphasis added). By singling out fixed costs for reimbursement, Congress signaled its intent to preclude other types of costs—namely, variable costs—from being "fully compensated." *See NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) (articulating the *expressio unius est exclusio alterius* standard).

Lake Region's interpretation would result in Medicare reimbursing hospitals for all operating costs—fixed and variable. But Congress rejected that type of dollar-for-dollar reimbursement scheme when it adopted IPPS in 1983. The new IPPS system was "intended to create incentives for hospitals to operate in a more efficient manner, since hospitals would be allowed to keep payment amounts in excess of their costs and would be required to absorb any costs in excess of the DRG rates." S. Rep. No. 98-23, at 1, 53 (1983), *as reprinted in* 1983 U.S.C.C.A.N. 143, 193. The VDA provides a narrow exception to this incentive-driven system: because hospitals cannot decrease their fixed costs on the fly like they can for variable costs, the VDA provides some offsetting compensation. But it was not meant to cover variable costs that are within management's control.

11

In the decades since IPPS was enacted, HHS has consistently affirmed this interpretation. This distinction between fixed and variable costs—and the emphasis on reimbursing only the former—has endured in each subsequent iteration of the governing regulations, including the 2007 and 2009 preambles cited by Lake Region. 52 Fed. Reg. 33,034, 33,049 (Sept. 1, 1987) (1987 revisions); 71 Fed. Reg. 47,870, 48,056 (Aug. 18, 2006) (2007 revisions); 73 Fed. Reg. 48,434, 48,630–31 (Aug. 19, 2008) (2009 revisions).

To be sure, the 2007 and 2009 preambles and the PRM include some inconsistent language, but they do not provide sufficient evidence for this Court to conclude that the Agency used a different policy before 2014. The 2007 and 2009 preambles provide:

> The adjustment amount is determined by subtracting the second year's [DRG] payment from the lesser of: (a) The second year's costs minus any adjustment for excess staff; or (b) the previous year's costs multiplied by the appropriate IPPS update factor minus any adjustment for excess staff. The [hospital] receives the difference in a lump-sum payment.

71 Fed. Reg. 47,870, 48,056 (Aug. 18, 2006); 73 Fed. Reg. 48,434, 48,631 (Aug. 19, 2008). The preambles refer to the "second year's *costs*" without specifying whether that number includes variable costs or not. Because ambiguous language like this "gathers meaning from the words around it," the Court looks to the surrounding text. *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 596 (2004) (quoting *Jones v. United States*, 527 U.S. 373, 389 (1999)).

A few paragraphs earlier in both preambles, the text reaffirms that VDA payments "were designed to compensate [a hospital] for the *fixed costs* it incurs [in the fiscal year], which it may be unable to reduce. *Such costs include the maintenance of necessary core staff and services.*" 71

12

Fed. Reg. 47,870, 48,056 (Aug. 18, 2006); 73 Fed. Reg. 48,434, 48,630 (Aug. 19, 2008) (emphasis added). The preambles go on to note that "not all staff costs can be considered fixed costs. . . . If [a hospital] has an excess number of nursing staff, the cost of maintaining those staff members is deducted from the total adjustment." 71 Fed. Reg. 47,870, 48,056 (Aug. 18, 2006); 73 Fed. Reg. 48,434, 48,630 (Aug. 19, 2008). Because the Agency carved away excessive-staffing costs from fixed costs in these preceding sections, it is reasonable to think that the Agency intended to do the same thing when it said that, in some circumstances, the VDA should be calculated by subtracting the DRG payment from "[t]he second year's costs minus any adjustment for excess staff." It would not make sense to reimburse hospitals for all variable costs except those due to excessive staff, especially considering the statutory directive that VDA payments were intended to reimburse only "those over which management has no control." 48 Fed. Reg. 39,752, 39,781 (Sept. 1, 1983). But it is logical for the Agency to subtract "any adjustment for excess staff" from the hospital's fixed costs because hospitals can eliminate excessive staff during periods of decline in patient volume.

With regards to the PRM, the Agency included an example in the manual to demonstrate how Medicare administrative contractors should perform the calculation. The example provides that because the "Hospital C's [] Program Inpatient Operating Cost was less than that of [the prior year's] increased by the PPS update factor, its adjustment is the entire difference between [the] Program Inpatient Operating Cost and [the total] DRG payments" received by the hospital. PRM 15-1, § 2810.1(B) (Mar. 1990); *see also* ECF 20 at 19. Lake Region claims that this example shows that the VDA is intended to compensate all operating costs, including both fixed and variable costs.

At first glance, this example seems to strongly support Lake Region's argument. There is no indication that "Program Inpatient Operating Cost" was meant to include only fixed costs (though, there's also no indication that it was meant to include variable costs, either). But this

example was just one of two that the Agency included in this section. The other example provided that "Hospital D's [] Program Inpatient Operating Cost exceeded that of [the prior year] increased by the PPS update factor, so the adjustment is the difference between [the prior year's] cost adjusted by the update factor and [the current year's] DRG payments." ECF 20 at 19. Reading these two examples alongside each other suggests that they were included to demonstrate how "the lesser of" two possible minuends should be identified, rather than to instruct Medicare contractors to include variable costs in the minuend. But even if the second example were not included, the Court could not conclude that a single ambiguous example, which does not explicitly instruct Medicare contractors to include variable costs in the minuend, was intended to change the Agency's longstanding approach to calculating the VDA amount.

Using context and structure to interpret regulations can be a subtle business, but here the Agency made its intention clear through decades of regulatory revisions and administrative adjudications: the VDA is meant to compensate fixed costs, not variable costs. A few stray phrases do not provide sufficient evidence to contradict this overarching goal. Because the Agency's VDA calculation method was not changed by the PRM, 2007 revisions, or the 2009 revisions, the Court concludes that no change occurred in 2014 and, therefore, the Agency did not need to give the public notice and an opportunity to comment.

**B.  The Secretary's interpretation does not violate 42 U.S.C. § 1395ww(d)(5)(D)(ii).**

Lake Region also argues that the Secretary's method for calculating the hospital's VDA amount violated the terms of 42 U.S.C. § 1395ww(d)(5)(D)(ii). ECF 17-1 at 25–31. Because the Secretary is tasked with administering the statute, and because the Secretary interpreted the statute through formal adjudication, the Court must review the Agency's interpretation under the *Chevron* two-step test. At Step One, the Court must give effect to Congress's clear intent if "Congress has directly spoken to the precise question at issue." *Chevron U.S.A. Inc. v. Nat. Res. Def. Council,*

*Inc.*, 467 U.S. 837, 842 (1984). But if the statute is "silent or ambiguous with respect to the specific issue," then the Court will uphold the Secretary's interpretation so long as it is "based on a permissible construction of the statute." *Id.* at 843.

### 1. Chevron Step 1

The first step of *Chevron* requires courts to determine whether Congress has "unambiguously foreclosed the agency's statutory interpretation." *Catawba Cnty. v. EPA*, 571 F.3d 20, 35 (D.C. Cir. 2009). If the statute "prescribe[s] a precise course of conduct other than the one chosen by the agency, or [grants] the agency a range of interpretive discretion that the agency has clearly exceeded," then the agency's interpretation will be held unlawful. *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 659 (D.C. Cir. 2011).

Here, the applicable statute makes clear that the Secretary "shall provide" sole community hospitals experiencing a decline in patient volume "such adjustment to the payment amounts under this subsection . . . as may be necessary to fully compensate the hospital for the fixed costs it incurs in the period in providing inpatient hospital services, including the reasonable cost of maintaining necessary core staff and services." 42 U.S.C. § 1395ww(d)(5)(D)(ii). From this text, the Parties identify three possible calculation methods: the method applied by the Secretary (acting through the CMS Administrator), the method used by the PRRB, and the method that Lake Region erroneously believes is described in the PRM. *See* ECF 21 at 5–6. While the first two calculation methods fall within the range of permissible interpretations, the third does not. As discussed above, *see supra* at 11–14, this third interpretation contradicts the clear statutory directive that the VDA compensate only fixed costs, not variable costs.

The statute does not prescribe a particular VDA calculation method. While the statute makes clear that the Secretary must "fully compensate" eligible hospitals for their fixed costs, it does not specify how the Secretary should accomplish that task. Specifically with regards to Lake

Region's claim, the statute does not establish whether DRG revenue should be compared against fixed costs as a whole, or if it should be adjusted to estimate the portion of DRG revenue that was intended to compensate fixed costs. Through its silence, Congress delegated resolution of this issue to the Secretary. *See Methodist Hosp. of Sacramento*, 38 F.3d at 1230.

The Secretary did not exceed their interpretive discretion. The statute instructs the Secretary to provide an adjustment to DRG payments that would "fully compensate" hospitals for their fixed costs, and the Secretary's calculation method does that (or at least a version of that): it provides VDA payments to make up any difference between DRG revenue and fixed costs. This calculation method ensures that, during periods of decline in patient volume, hospitals receive enough Medicare funding to reimburse every dollar spent on fixed costs. Without more detailed instructions, the Court cannot conclude that Congress "*unambiguously* foreclosed the agency's statutory interpretation." *Catawba Cnty.*, 571 F.3d at 35 (emphasis added).

Lake Region disagrees, contending that the Secretary's interpretation of 42 U.S.C. § 1395ww(d)(5)(D)(ii) is unreasonable when read alongside two others provisions: 42 U.S.C. § 1395ww(d)(1)(A), which says that DRG payments reimburse the "operating costs of inpatient hospital services," and 42 U.S.C. § 1395ww(a)(4), which defines "operating costs" to consist of both fixed and variable costs.[5] *See* ECF 17-1 at 26. According to Lake Region, these provisions show that DRG payments are meant to reimburse more than just fixed costs, and therefore comparing total DRG revenue to a hospital's fixed costs is like comparing apples to oranges. To

---

[5] 42 U.S.C. § 1395ww(a)(4) defines "operating costs" as including  "all routine operating costs, ancillary service operating costs, and special care unit operating costs with respect to inpatient hospital services as such costs are determined on an average per admission or per discharge basis." Because it includes "all routine operating costs," this provision naturally includes both fixed and variable costs. *See Stephens Cnty. Hosp. v. Becerra*, 2021 WL 4502068, at *9 (D.D.C. Sept. 30, 2021).

get a true apples-to-apples comparison and ensure full compensation, the amount of DRG revenue intended to cover fixed costs must be isolated and compared against actual fixed costs.

While Lake Region's interpretation is sensible, it is not compelled by the statute. DRG payment rates "cannot be easily separated and allocated to particular items or services." *Appalachian Reg'l Healthcare, Inc. v. Shalala*, 131 F.3d 1050, 1053 (D.C. Cir. 1997). That's because they are not calculated with careful attention to the fixed and variable costs associated with treating specific illnesses. DRG payments are calculated through a more generalized process: a nationwide average cost of inpatient services is adjusted for each DRG classification to reflect the amount of resources needed to treat the specific DRG. *See Cnty. of Los Angeles*, 192 F.3d at 1008. Although this formula is meant to determine the total operating costs of treating patients, which necessarily includes both types of expenses, it does not speak in terms of fixed versus variable costs. Instead, it generates a single, undifferentiated number for each DRG that will be used in the upcoming year.

In the absence of statutory language dissecting DRG payments into their fixed and variable components, the Court concludes that the Secretary did not act beyond their interpretive discretion in considering the two types of costs to be one unit when asking if fixed costs were "fully compensated" by DRG revenue.

### 2. Chevron Step 2

At *Chevron* Step 2, the Court asks whether the agency's interpretation is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. Although the agency must have "offered a reasoned explanation for why it chose that interpretation," the Court's review is "highly deferential." *Vill. of Barrington*, 636 F.3d at 665. The Court's review in this case is even more deferential than normal because it involves Medicare, a statutory program of "tremendous

complexity." *Cmty. Care Found. v. Thompson*, 318 F.3d 219, 225 (D.C. Cir. 2003) (quoting *Methodist Hosp. of Sacramento*, 38 F.3d at 1299).

The Secretary's interpretation of 42 U.S.C. § 1395ww(d)(5)(D)(ii) is reasonable, even if it might not be the best. The provision can sensibly be understood as instructing the Secretary to ensure that fixed costs were "fully compensated" by unmodified DRG payments and, if needed, a VDA. Indeed, Lake Region's argument might be a bit overstated at this point: at least eight different federal judges have found the Secretary's interpretation to be reasonable. *See Unity HealthCare v. Azar*, 918 F.3d 571 (8th Cir. 2019), *aff'g St. Anthony Reg'l Hosp. v. Azar*, 294 F. Supp. 3d 768 (N.D. Iowa Feb. 6, 2018) *and Unity Healthcare v. Hargan*, 289 F. Supp. 3d 985 (S.D. Iowa Jan 30, 2018); *Trinity Reg'l Med. Ctr. v. Azar*, 2018 WL 4295290 (N.D. Iowa Sept. 10, 2018), *adopting in part Trinity Reg'l Med. Ctr. v. Azar*, 2018 WL 1558451 (N.D. Iowa Mar. 19, 2018) (magistrate judge's report and recommendation); *Stephens Cnty. Hosp. v. Becerra*, 2021 WL 4502068 (D.D.C. Sept. 30, 2021).

Additionally, the Secretary considered the relevant aspects of the problem. The Secretary defined the fixed costs that would be eligible for reimbursement under the VDA: "those over which management has no control." 48 Fed. Reg. 39,752, 39,781 (Sept. 1, 1983). And when it became apparent that hospitals were using their VDA eligibility to procure additional funds despite turning a profit on their original DRG revenue, the Secretary clarified that the VDA should not "exceed the difference between the hospital's Medicare inpatient operating costs and the hospital's total DRG revenue." 42 C.F.R. § 412.92(e)(3) (1987). At every step along the way, the Secretary thoughtfully considered the important issues and structured the payment scheme around them. The fact that the Secretary did not explain the reason for considering DRG payments as a whole, instead of dividing them into fixed and variable components, does not invalidate the policy. Given that the

Medicare Act itself treats DRG payments as undifferentiated amounts, it is reasonable for the Secretary to do the same.

The PRRB's interpretation might be better than the Secretary's, and the Secretary might have even conceded this point by prospectively adopting that method in 2017. But when faced with a reasonable agency interpretation of an ambiguous statute, "*Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005). Given the highly deferential nature of the inquiry at *Chevron* Step Two, the Court finds that the Secretary's interpretation is reasonable.

### C.  The Secretary's policy is not arbitrary and capricious.

Lake Region's third claim alleges that the CMS Administrator "arbitrarily and capriciously rejected applying the PRRB's calculation method." ECF 17-1 at 35. However, the same reasons for dismissing Lake Region's *Chevron* Step Two claim also warrant dismissal of its arbitrary and capricious claim. The analysis of disputed agency action under *Chevron* Step Two and arbitrary and capricious review is often "the same, because under Chevron step two, [the court asks] whether an agency interpretation is arbitrary or capricious in substance." *Agape Church, Inc. v. FCC*, 738 F.3d 397, 410 (D.C. Cir. 2013) (quoting *Judulang v. Holder*, 565 U.S. 42, 52 n.7 (2011)).

Lake Region raises one additional argument in its arbitrary and capricious challenge that requires a response. Lake Region argues that the CMS Administrator's rationale for rejecting the PRRB's calculation method lacked merit because the Agency had already adopted the PRRB's method prospectively. ECF 17-1 at 35. But "prospectively adopt[ing] a new interpretation . . . is not a sufficient reason to find the Secretary's prior interpretation arbitrary or capricious." *Unity HealthCare v. Azar*, 918 F.3d 571, 577 (8th Cir. 2019). An agency is obligated to continually

evaluate the "wisdom of its [current] policy." *Nat'l Cable & Telecommunications Ass'n*, 545 U.S. at 981 (quoting *Chevron*, 467 U.S. at 864). The fact that the Agency fulfilled its obligation and was eventually persuaded to adopt the PRRB's calculation method does not mean that its prior approach was arbitrary and capricious.

**D.  The Secretary's interpretation does not violate 42 C.F.R. § 412.92(e)(3).**

Finally, Lake Region argues that the Secretary's calculation method is contrary to governing regulations. Courts defer to an agency's interpretation of its own regulations if three conditions are met: the regulation is "genuinely ambiguous;" the agency's interpretation is "reasonable;" and "the character and context of the agency interpretation entitles it to controlling weight." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415–16 (2019).

The regulation at issue provides that the "adjustment amount [shall] not exceed the difference between the hospital's Medicare inpatient operating costs and the hospital's total DRG revenue." 42 C.F.R. § 412.92(e)(3) (2013). Lake Region contends that this language instructs the Secretary to provide "at least *some* volume decrease adjustment where . . . a hospital's DRG payments fall short of its operating costs." ECF 17-1 at 31.

Lake Region misreads the text, especially given the background structure, history, and purpose of the VDA. This regulation was added in 1987 after hospitals submitted VDA requests when their patient volume declined, despite receiving enough DRG revenue to fully cover operating costs. *See* 52 Fed. Reg. 22,080, 22,091 (June 10, 1987) (proposed rule). Seeking to clarify this confusion, the Secretary established that volume decrease adjustments would "not exceed the difference" between operating costs and DRG revenue. *Id.* This language imposed a ceiling on VDA amounts, not a floor.

While the provision sets a limit on VDA amounts, it does not prescribe a formula for the Secretary to use in calculating the specific amount. Multiple different formulas—including the

ones used by the Secretary and the PRRB—comport with this provision. 42 C.F.R. § 412.92(e)(3) is "genuinely ambiguous" with regards to how VDA payments should be calculated.

The Secretary's calculation method is a reasonable interpretation of this ambiguous text. It produces VDA amounts that do not "exceed" the ceiling imposed by 42 C.F.R. § 412.92(e)(3), and it harmonizes with the surrounding provisions. The hospital's "needs and circumstances," "fixed (and semi-fixed) costs," and "length of time the hospital has experienced a decrease in utilization" are still considered when determining which expenses count as fixed costs. *See id.*

Finally, the "character and context of the agency interpretation entitles it to controlling weight." *Kisor*, 139 S. Ct. at 2416. "Deference is all the more warranted" in this case because it involves the Medicare program, a regulatory labyrinth that implicates the Agency's substantive expertise. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). And, contrary to Lake Region's argument, the Agency has not flip-flopped its policy in a way that would undercut that deference: the Secretary has maintained the same calculation methodology from 1987 until 2017. *See supra* at 9–14.

Because the conditions laid out in *Kisor* are satisfied, the Court defers to the Agency's interpretation of its own regulations and rejects Lake Region's claim.

## IV.    CONCLUSION

For the foregoing reasons, the Secretary's Cross-Motion for Summary Judgment is granted, and Lake Region's Motion for Summary Judgment is denied. A separate order consistent with this decision will accompany this memorandum opinion.

**SO ORDERED**.

DATE: October 17, 2022

_____
Jia M. Cobb
U.S. District Court Judge